FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

99 AUG 12 PM 3: 31

U.S. DISTRICT COURT
N.D. OF ALABAMA

THE PAUL REVERE LIFE            )
INSURANCE COMPANY,              )
                                )
        Plaintiff,              )
                                )
v.                              )    Case No. CV-98-PT-3066 M
                                )
THE ESTATE OF RICHARD L.        )
HOLTER,                         )
                                )
        Defendant.              )

ENTERED

**MEMORANDUM OPINION**

AUG 1 2 1999

This cause comes to be heard on plaintiff Paul Revere Life Insurance Company's ("Paul

Revere" or the "Company") Motion for Summary Judgment filed on June 17, 1999, and on defendant

Estate of Richard L. Holter's (the "Estate") Motion for Judgment on the Pleadings, or, in the

Alternative for Partial Summary Judgment filed June 18, 1999. This case arises out of an agreement

allegedly reached between the decedent, Richard L. Holter ("Holter") and Paul Revere for the

settlement of Holter's claims pursuant to two Paul Revere disability insurance policies under which

he (Holter) was receiving lifetime monthly benefits. The Estate contends that, prior to Holter's death,

he and Paul Revere entered into a valid and binding settlement agreement under which Paul Revere

was to pay Holter a lump sum of $475,000, and that Paul Revere, therefore, owes the Estate the full

value of the lump sum. Paul Revere argues that the agreement was never finalized and that the Estate

is entitled only to survivor's benefits totaling $10,830. Paul Revere filed the above-styled declaratory

judgment lawsuit on December 9, 1998 seeking a declaration that it did not owe the Estate $475,000,

and that the Estate was entitled only to the survivor's benefits. The Estate filed its Answer and



Counterclaim on February 24, 1999. Count One of the Counterclaim is a claim for breach of contract based on the alleged lump-sum settlement agreement. Count Two alleges bad faith breach of contract on the part of Paul Revere for failing to make the lump sum payment pursuant to the alleged settlement. Paul Revere seeks summary judgment in favor of its declaratory judgment claim and against both of the Estate's claims. The Estate seeks summary judgment against Paul Revere's declaratory judgment action and in favor of its breach of contract claim, contending that the bad faith failure to pay claim should proceed to trial.

## I. Factual Background and Summary of Claims

The Estate's decedent, Dr. Richard Holter became totally disabled at some time in 1992. Paul Revere began paying disability benefits to Holter on or about June 3, 1992 pursuant to the terms of four disability insurance policies he had purchased from the company: Policy No. 01-02310808 and Policy No. 01-02319662, issued on November 18, 1987 and Policy No. 01-02474118 and Policy No. 01-02474119, issued on October 8, 1990. Holter received all of the benefits to which he was entitled from Policy No. 01-02319662 and Policy No. 01-02474119 at some time prior to 1998. The remaining two policies were to provide disability coverage for the remainder of Holter's life so long as he continued to be totally disabled.

Holter and Paul Revere entered into negotiations in September of 1998 regarding the possibility of Holter receiving a lump sum cash payment in lieu of continued monthly disability payments under the two remaining policies. Pursuant to these negotiations, Paul Revere employee Kevin Malone ("Malone"), in a letter to Holter dated September 17, 1998, stated: "At this time we [Paul Revere] are prepared to offer the sum of $475,000 for the settlement of your claims and

surrender of [the two remaining policies]."[1] The letter further stated ". . . we would appreciate your response to our proposal by the close of business, Monday, October 19, 1998," and that "in the event that we have not received a response from you by that date our offer should be considered withdrawn." The letter closed with the statement, "I look forward to speaking with you again in the next couple of weeks."[2]

Dr. Holter telephoned Malone on October 1, 1998, and stated that he wished to accept the offer. On that same day, Malone wrote at least two internal memos documenting the incident. One of those memos states, in part, "I contacted Shelly [a Paul Revere claims representative] to inform her of Dr. Holter's verbal acceptance of settlement."[3] Another states:

Dr. Holter contacted this office this morning to indicate that he had our proposal reviewed by a financial analyst and his attorney and felt this was a fair offer and wished to accept the offer of $475,000. He was interested in doing whatever paperwork was necessary to expedite the process. . .

The insured wanted to know how the funds would be distributed. I explained that once we are in receipt of the settlement agreement signed and notarized we would overnight a lump-sum check in the amount of $475,000 for full surrender of his policies with Paul Revere. . .

Paul Revere sent Holter a written Settlement Agreement and Release ("Settlement Agreement") on October 2, 1998. The letter accompanying the Settlement Agreement stated that:

Upon receipt of the properly executed Agreement and return of [Holter's disability insurance

_____

[1] The parties both acknowledge that Malone was authorized by Paul Revere to make this statement.

[2] Malone has testified that prior to the sending of this letter he had discussed with Holter the requirement that he (Holter) execute a settlement agreement and release prior to obtaining the lump sum payment. The Estate has contended that the requirement of an actual written settlement agreement did not materialize until after Holter had verbally accepted the offer.

[3] Malone claims that his use of the words "verbal acceptance" was not intended to indicate the formation of a contract or the completion of the deal.

policies], we will immediately sign, notarize and provide you a copy of the executed
Agreement as well as forward the settlement check to you.

The letter also encouraged Holter to have the Settlement Agreement reviewed by an attorney. The

Settlement Agreement contained a release of all claims against Paul Revere and a promise not to sue.

It also contained the following language:

On several occasions, Holter has openly and freely held discussions with Paul Revere
representatives regarding a compromise settlement of future benefits which may be due and
the parties now intend that the full terms and conditions of the compromise and settlement
be set forth in this release.

Malone has acknowledged that the Settlement Agreement represented a memorialization of what had

been previously discussed by Paul Revere and Holter and that the Settlement Agreement was

committing the parties' oral conversations to writing,[4] but also stresses that Holter was made aware,

on numerous occasions, of the fact that he would not receive payment until the Settlement Agreement

was executed and the policies were surrendered.

Paul Revere noted in memos and letters during the following four weeks that Holter was in

the process of drawing up documents to create a living will and trust fund, and that having such

documents in place prior to receipt of the payment was "vital" to protecting the interests of his

children. Malone's memo of October 9, 1998 notes that: "The insured will provide us with the

completed settlement agreement as soon as possible, but just wanted to give me a verbal confirmation

of his acceptance of the settlement agreement." On October 14, Holter, through his financial adviser,

Teresa Hawkins ("Hawkins"), requested an extension of the deadline to accept the settlement to be

moved from October 19 to October 27 so that trust documents regarding the payout could be fully

---

[4] Paul Revere notes that Malone drafted only the recitals portion of the Settlement
Agreement and that the Agreement amounts to much more than an after the fact account of what
had already been agreed upon.

prepared. Hawkins has stated that she thought the settlement offer had been accepted, that the settlement was "a done deal," and that she called Paul Revere simply to request more time to set up a trust. She also, however, acknowledges that Holter informed her of the existence of the Settlement Agreement and that, "he had an agreement that he needed to send in."

Paul Revere continued to pay benefits to Holter pursuant to the insurance policies throughout the negotiation period. Holter contacted Paul Revere and requested another month of benefit payments on October 20, 1998. On that same day, Paul Revere sent Holter two checks in payment of disability benefits on both policies through November 3, 1998. Both checks were negotiated. The payments made on October 20 were apparently the last payments made by Paul Revere to Holter pursuant to the policies.

Holter died on October 25, 1998 without having signed the Settlement Agreement and without having surrendered the insurance policies. Paul Revere was notified of Holter's death on December 2, 1998. Nonetheless, Paul Revere never sent Holter his monthly disability payments for the month of November, 1998, despite the fact that the company admittedly had no knowledge of his death.

As noted above, Paul Revere filed the above-styled declaratory judgment lawsuit on December 9, 1998 seeking a declaration that it did not owe the Estate $475,000, and that the Estate was entitled only to the survivor's benefits of $10,830. According to Paul Revere, Holter had, at his death, been paid all insurance benefits to which he was entitled under his policies. Paul Revere claims that the settlement between itself and Holter was never entered into, as the execution of the written Settlement Agreement and surrender of the policies and all related claims were necessary for the formation of a binding contract. Mr. Malone has testified that, in Paul Revere's eyes, Holter, at his death, still had the ability to withdraw from the agreement without fear of recourse from Paul Revere.

Paul Revere thus contends that Holter never accepted the offer, but simply communicated his intention of doing so in the future. Paul Revere thus argues that it is entitled to summary judgment on both its declaratory judgment claim and on the Estate's breach of contract claims.

The Estate filed its Answer and Counterclaim on February 24, 1999. Count One of the Counterclaim is a claim for breach of contract based on the alleged lump-sum settlement agreement. Count Two alleges bad faith breach of contract on the part of Paul Revere for failing to make the lump sum payment pursuant to the alleged settlement. The Estate has filed a Motion for Judgment on the Pleadings, or, in the Alternative, for Partial Summary Judgment, seeking judgment on Count One of its Counterclaim.

## II. The Breach of Contract Claim and Action for Declaratory Judgment

### A. The Estate's Breach of Contract Argument

The Estate argues that the offer presented to Holter by Paul Revere does not limit the manner in which it can be accepted and that a verbal acceptance was, therefore, sufficient to bind the parties to the settlement agreement. According to the Estate, nothing in Paul Revere's September 17 letter indicates that acceptance requires the actual execution of a release. Nor does the letter explicitly require Holter to place anything in writing. Rather, argues the Estate, the letter invites Holter to accept the offer by promising to release his claims to future monthly benefits. The letter, according to the Estate, actually invited a verbal response by stating, "I look forward to speaking with you again in the next couple of weeks."

According to the Restatement (Second) of Contracts (1981) § 30:

(1)    An offer may invite or require acceptance to be made by an affirmative answer in words, or by performing or refraining from performing a specified act, or may empower the offeree to make a selection of terms in his acceptance.

(2)    Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.

In further clarifying § 30(2), the § 32 of the Restatement states that, "In case of doubt an offer is

interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses." As stated in § 30(1) of the Restatement, an offer may require acceptance to be made through performance of a given act or acts. The Estate recognizes that Paul Revere could have made acceptance of its offer explicitly dependent upon the performance of some action or set of actions. However, it argues that Paul Revere's offer does not do so and that Holter's verbal acceptance was, therefore, enough to create a binding agreement.[5] Whether a proposal is meant to be an offer and the nature of the offer, if any, is determined by the outward manifestations of the parties, rather than by their uncommunicated beliefs. Ex parte Amoco Fabrics and Fiber Co., 729 So.2d 336 (Ala. 1998) (addressing language in an employment manual). The Estate argues that if Paul Revere meant to make acceptance of its offer dependent upon the actual acts of surrendering the policies and signing the release, it did not communicate that fact to Holter. Rather, Holter was, according to the Estate, left with the impression that a verbal acceptance would suffice. The Company's outward manifestations, argues the Estate, do not refute Holter's

---

[5] In Mott v. Jackson, 55 So. 528 (Ala. 1911), the Alabama Supreme Court, in addressing whether performance would suffice as acceptance to an offer where the offeror had not mandated a specific manner of acceptance, held that:

> While a party making an offer has a right to specify how it shall be accepted, in order to complete the contract, yet, if he does not so specify, it is clear that anything which in law would be an acceptance, so long as the offer is left open, would be sufficient, and an acceptance by act is as effective as acceptance by words.

55 So. at 529. The Estate contends that Mott is, through analogy, applicable to this case in that, while Paul Revere did not specify the manner of acceptance, the verbal acceptance given by Holter was just as effective as performance would have been.

Further, the Alabama Supreme Court has stated that "The existence ... of a contract is determined by reference to the reasonable meaning of the parties' external and objective manifestations of mutual assent. Conduct of one party from which the other may reasonably draw the inference of assent to an agreement is effective as acceptance." Deeco, Inc. v. 3-M Co., 435 So.2d 1260 (Ala.1983). The Estate argues that such conduct clearly took place in this case.

alleged belief that verbal acceptance alone would create a binding agreement.

According to the Estate, the issues in this case are similar to those presented to the Alabama Supreme Court in Pennsylvania Life Ins. Co. v. Green, 367 So.2d 463 (Ala. 1978). In Green, the plaintiff-insured sought to enforce a settlement agreement of his claim for benefits under his health insurance policy. Plaintiff's attorney had entered into a verbal agreement with the insurance company to settle certain specific medical claims and a lawsuit based on those claims. All the terms of the agreement were met, aside from the signing of the release which, the plaintiff claimed, contained terms not agreed to orally. The plaintiff thus sued to enforce the oral agreement as it was originally conceived by the parties. The Alabama Supreme Court upheld the trial court's finding that the oral agreement was enforceable, stating:

> We think the respective rights and duties under the verbal agreement were sufficiently delineated to justify the trial court's conclusions that a binding agreement had been reached.
>
> The testimony of both defendant's employee and plaintiff's attorney indicates that plaintiff had agreed to release defendant from liability only as to such future claims that might arise from the six medical conditions [already discussed]. However, the broad wording of the release form sent to plaintiff . . . could reasonably be construed as providing for a surrender of any and all claims by plaintiff under the policy. Plaintiff's refusal to sign the release was not a failure to accept the offer of settlement, as defendant contends, but rather a non-performance of his contractual duty justified by defendant's breach of the verbal agreement.

Green, 367 So.2d at 467.[6] The Estate thus contends that Holter's failure to sign the release amounts

---

[6] Paul Revere argues that the facts presented in Green are clearly distinguishable from those presented here and that the reasoning of Green should not apply to this case. In Green, the parties disputed whether or not the insured had agreed to surrender his policies and, as a result, the insured refused to sign the settlement agreement. Here, argues Paul Revere, it is undisputed that the surrender of the policies was a condition of the settlement. The Estate has not argued that the Settlement Agreement contained any conditions that were not discussed prior to the sending of the Agreement to Holter. Paul Revere thus argues that the facts in this case are substantially different from those of the Green case and that the decision of the Green court should not be applied to a situation which is clearly distinct.

to, at most, a non-performance of a contractual duty that was, at best, implied by the terms of Paul Revere's offer.[7]

The Estate also contends that, to the extent this court concludes that there are material facts at issue in this case, those facts should be resolved by a jury. It notes that cases involving similar factual questions have, in the past, been presented to a jury. Thus, in Ex parte Holland Manufacturing Company, 689 So.2d 65, 66 (Ala. 1996), the Alabama Supreme Court concluded that the issue of whether an unsigned "blanket purchase order" was accepted and acted upon, forming a contract, was a jury question. Similarly, in Stephenson Brick Co. v. Bessemer Engineering & Construction Co., 118 So. 570 (Ala. 1928), the court found that the question of whether a written offer was unconditionally accepted and acted upon, forming a contract, presented a question for the jury.

### B. Paul Revere's Argument in Favor of its Declaratory Judgment Claim

Paul Revere contends that it is entitled to a declaratory judgment in this case based on the following contract theories:

(1)    unilateral vs. bilateral contract;

(5)    failure of consideration;

(6)    nonoccurrence of the conditions precedent to the formation of a contract;

(7)    impossibility of performance/acceptance;

(8)    requirement of personal acts.

The court will address the parties' contentions as to each of these theories.

### 1. Unilateral vs. Bilateral Contracts

---

[7] The Estate does not discuss the consequences of such a failure to perform a contractual duty.

### a. Paul Revere's Argument

"It is true as a matter of hornbook law that a unilateral contract consists of a promise by one party and an acceptance by performance on the part of the other party." Henig Furs, Inc. v. J.C. Penny Co., Inc., 811 F.Supp. 1546, 1557 (M.D. Ala. 1993); see also, 17A Am.Jur.2d Contracts § 100 (1991); Williston on Contracts § 1:17 (4th Ed. 1990).[8]

While conceding that its letter of September 17, 1998 constituted an offer, Paul Revere contends that the offer was for a unilateral contract, inviting acceptance through performance – and only through performance.   Thus, the letter offering a settlement stated that, ". . . we are prepared to offer the sum of $475,000 for the settlement of your claims and surrender of [the two remaining policies]." (Emphasis added). According to Paul Revere, the offer did not simply call for agreement as to the settlement value or a promise to surrender the policies, but for the settlement of the claims and the actual surrender of the policies.[9]

Alabama courts have not addressed the question of whether a proposed settlement agreement of this type constitutes a unilateral contract offer. Paul Revere argues, however, that in Coffman Industries, Inc. v. Gorman-Taber Co., 521 S.W.2d 763, 769 (Mo. App. 1975), an appeals court in Missouri addressed this very issue, stating:

> The transaction between Fidelity and Gorman-Taber, however, was not an exchange of promises, but a performance by Gorman-Taber [settlement and release of the Coffman claim] in consideration of the Fidelity promise to pay the contract price.   It was an offer for a

---

[8] The Restatement (Second) of Contracts has abandoned use of the terms "unilateral" and "bilateral."

[9] Paul Revere stresses that at the time of Holter's death, the settlement agreement could have been abandoned by either party. In Benton Mercantile Co. v. Owensboro Wagon Co., 91 So. 784 (Ala. 1921), the court held that as long as a purported contract is open to approval, and subject to modification by mutual consent, it is not binding on the parties.

unilateral contract. . . . The assent of Gorman-Taber as promisee to the unilateral contract was shown by the performance of the act requested: the delivery of the release from Coffman. . . . The contractual element of mutual assent was shown by evidence that the performance given by the promisee was as requested by the promisor.

521 S.W.2d at 769. Paul Revere also cites Reprosystem B.V. v. SCM Corp., 630 F.Supp. 1099,

1101 (S.D.N.Y. 1986), where the court characterized a settlement agreement as a unilateral contract.

The Alabama cases addressing the existence of unilateral contracts do not, according to Paul Revere, conflict with the Coffman and Reprosystem characterizations. Alabama courts have found unilateral contracts to exist in situations involving ticket sales, Sims v. Etowah County Bd. Of Education, 377 So.2d 1310 (Ala. 1976), the vesting of retirement plans, Board of Trustees of Policeman's and Fireman's Retirement Fund v. Cary, 373 So.2d 841 (Ala. 1979), and employer-employee relationships, see e.g. Ex parte Amoco Fabrics and Fiber Co., 729 So.2d 336 (Ala. 1998). In each of the above-noted situations, Alabama courts found that an offer for a unilateral contract was involved and that the offer was accepted by performance. This case is different, argues Paul Revere, in that the actions required for acceptance were never taken by Holter – he never executed the Settlement Agreement and never surrendered his policies.[10] According to Paul Revere, because Holter failed to take such actions, he never accepted the offer and never established mutuality of assent. Thus, argues Paul Revere, no contract was formed. See e.g. Fant v. Champion Aviation, Inc., 689 So.2d 32 (Ala 1997) (offer, acceptance, consideration and mutual assent are necessary elements to a contract claim); Ex parte Holland Manufacturing Co., 689 So.2d 65 (Ala. 1996) (same).

---

[10] It appears that Holter had actually lost the policies to be surrendered and could not, therefore, have turned over the actual documents. However, Paul Revere did send Holter a form along with the Settlement Agreement that would have allowed for "surrender" of the policies without Holter having to produce the actual documents.

Paul Revere contends that the court's language in Contractors Success Group, Inc. v. Service Trust Organization, Inc., 681 So.2d 212 (Ala.Civ.App. 1996), is applicable to this case. Contractors, Service Trust Organization, Inc. ("STO") filed a motion to enforce an oral settlement that had been allegedly reached between the parties in connection with a civil lawsuit between STO and Contractors Success Group, Inc. ("CSG"). The agreement was allegedly completed when one of the two 50% owners of CSG, in speaking with STO's principal stockholder, told the STO representative that a proposed settlement would be acceptable to CSG if a given passage of the proposed agreement was deleted. However, once the revised agreement was shown to CSG's attorneys and the company's other stockholder, CSG decided not to sign the agreement. STO, contending that the parties had reached a "meeting of the minds", and that Alabama law did not require a signed writing to enforce a settlement agreement then filed a motion to enforce the oral agreement. Paul Revere contends that the appeals court declined to find the oral negotiations binding because it was apparent from the evidence that the parties intended to reduce any settlement to writing. Paul Revere also notes that the court found that, from a public policy standpoint, a rule enforcing such agreements would make parties reluctant to communicate with one another during settlement negotiations and would therefore hinder attempts at settlement. Thus, the court stated:

STO also contends that [the CSG representative's] statements to [STO's representative] should serve to bind CSG to the proposed settlement, in the same manner as a party may orally bind himself to a contract, and that the settlement should thus be held valid and enforceable under general principles of contract law. We decline to adopt STO's construction. To do so would allow a party to call for the judicial enforcement of any aspect of oral negotiations toward a settlement and would have the practical effect of making a litigant reluctant to enter oral settlement negotiations. It is apparent from the voluminous record and protracted negotiations that these parties intended to reduce any settlement to a written agreement concurred in by all the parties. The right of a party to settle disputes through compromise should be and is encouraged by the courts of this state, and this court will not adopt a rule of construction that would make the parties reluctant to communicate

with one another in a settlement negotiation.

681 So.2d at 216. Paul Revere claims that, as in the Contractor case, the parties in this case had clearly entered into settlement negotiations, but that the correspondence exchanged during those negotiations shows that both parties anticipated that any resultant agreement had to be reduced to writing in the form of an executed settlement agreement and release.

#### b. The Estate's Response

Paul Revere's reliance on the Coffman case is, according to the Estate, misplaced. Coffman, notes the Estate, did not involve a release agreement between two parties to an oral contract. The oral contract agreement in Coffman was an agreement between the Gorman-Taber Co. and Fidelity whereby Gorman-Taber had to obtain a release of a disputed claim from a third party, Coffman, in order to trigger the oral agreement. The obtaining of the release from Coffman was a condition precedent to the formation of the contract. Thus, the release did not embody the oral agreement between Gorman-Taber and Fidelity, did not formalize that agreement and did not, in fact, refer to the agreement. Thus, according to the Estate, the Coffman decision provides no support for the proposition that a proposed settlement agreement constitutes a unilateral contract offer that can only be accepted through the execution of a release.

The Estate also challenges Paul Revere's reliance on the Contractors case. Paul Revere's contention that the Contractor case is applicable to the circumstances presented in this case is weakened by the fact that the court, before addressing its policy concerns regarding STO's oral contract argument, noted that Alabama Code (1975) § 34-3-21 and Rule 47 of the Alabama Rules of Civil Procedure governed the enforcement of settlement agreements with respect to pending

litigation. The court concluded that both the Alabama Code and the Rules of Civil Procedure expressly called for a signed writing in order to make a proposed settlement agreement enforceable and that the alleged agreement in the Contractor case was, therefore, unenforceable. See 681 So.2d at 215. Unlike the Contractor case, argues the Estate, the settlement agreement in this case does not involve the settlement of claims in connection with pending litigation and is not subject to controlling statutes or rules.[11]

The Estate thus argues that Holter's verbal acceptance of the Paul Revere offer was sufficient to form a contract that was binding on both parties. Once Holter telephoned Malone to accept the offer, according to the Estate, a binding contract was formed. Holter's request that the parties wait before actually performing was based not on his desire to further consider the matter, but to prepare for the completion of the contract. His acceptance, argues the Estate, was not conditional. The Estate notes that both Holter and Paul Revere acted as if a valid contract had been formed. Holter went about setting up a trust and allegedly looked into purchasing an apartment building, while, as noted above, Paul Revere stopped making benefits payments for dates after November 3, 1998 despite the fact that the company did not find out about Holter's death until December 2, 1998. According to the Estate, if Paul Revere had not recognized the existence of a binding obligation to pay the lump sum, it would have remained liable to Holter for monthly benefit payments and would not have stopped paying monthly benefits.

### 2. Failure of Consideration

---

[11] Further notable is the fact that the party in the Contractor case was attempting to enforce an agreement that it had written and sent to the opposing party. Here, the party attempting to enforce the agreement is the party who received the agreement.

### a. Paul Revere's Argument

In addition to arguing that its offer was for a unilateral contract, Paul Revere claims that the alleged contract between itself and Holter is unenforceable because of a lack or failure of consideration. Consideration, of course, is an essential element to a valid contract. See Fant, 689 So.2d at 37. Paul Revere, citing McWilliams v. American Medical International, Inc., 960 F.Supp. 1547, 1559 (N.D.Ala 1997), notes that consideration in unilateral contracts may take the form of an act, a forbearance, or creation or destruction of a legal right. In Allen v. Prater, 30 Ala. 458 (Ala. 1857), the Alabama Supreme Court stated that "the forbearance by a party to a pending suit, to prosecute a right asserted therein, and yielding up of the right thus asserted, is a sufficient consideration for a verbal promise by the adverse party to pay a certain sum of money." Paul Revere argues that, had the settlement agreement between itself and Holter been completed and executed, the arrangement would clearly have fallen within the circumstances described in Allen. However, argues Paul Revere, Holter never "yielded up the right" to sue the insurer or to receive monthly disability benefits, and, therefore, never provided the consideration required to complete the contract.

Paul Revere argues that even if this court were to construe its offer as one for a bilateral contract, the contract would still fail for "failure of consideration." Failure of consideration is described as "the neglect, refusal and failure of one of the contracting parties to do, perform, or furnish, after making and entering into the contract, the consideration in substance and in fact agreed on." Lemaster v. Dutton, 694 So.2d 1360, 1366 (Ala.Civ.App. 1996) (quoting on 17 C.J.S. Contracts § 129 (1963)). A failure of consideration is "predicated on the happening of events which materially change the rights of the parties, which events were not within their contemplation at the time of the execution of the contract." Id. In effect, a failure of consideration is the failure to

perform a promise contained in the agreement, and it is much like a breach. Id. (citing 17A Am.Jur.2d Contracts § 670 (1991)). Paul Revere argues that Holter's failure to execute the Settlement Agreement and failure to surrender his policies amounted to a failure of consideration according to the language of the Lemaster case, as those acts constituted the consideration for Paul Revere's lump sum payment

### b. The Estate's Response

According to the Estate, the signing of release was not identified by Paul Revere as a component of consideration. The Estate notes that the September 17th letter offers "the sum of $475,000 for the settlement of your claims and the surrender of [the two remaining policies]." The Estate, again citing Pennsylvania Life Ins. Co. v. Green, claims that Paul Revere has confused a post-contractual duty – the signing of the release – with the failure of consideration. The consideration provided by Holter, according to the Estate, was his agreement to forego future monthly payments

### 3. Conditions Precedent

#### a. Paul Revere's Argument

Paul Revere also argues that Holter failed to satisfy the conditions precedent to the formation of the contract. According to Paul Revere, the execution of the Settlement Agreement and the surrender of the policies represented conditions precedent to the formation of the contract. Because Holter failed to satisfy these conditions, contends Paul Revere, the company was never bound by the agreement. According to 17A Am.Jur.2d Contracts § 34, pp. 62-63 (1991):

In negotiating a contract the parties may impose any condition precedent, the performance

> of which is essential before they become bound by the agreement; in other words, there may
> be a condition precedent to the existence of a contract. Accordingly, where the parties to a
> proposed contract have agreed that the contract is not to be effective or binding until certain
> conditions are performed or occur, no binding contract will arise until the conditions specified
> have occurred or been performed.

Further, Paul Revere notes that the Supreme Court of Alabama has stated that "a plaintiff could not

recover in a breach of contract action where 'it was distinctly understood that the contract was not

to become effective unless' another executed it and the other had not done so." Reeves Cedarhurst

Dev'p Corp. v. First American Federal Savings and Loan Assn., 607 So.2d 180, 182 (Ala. 1992)

(quoting Ferlesie v. Cook, 78 So. 915, 916 (Ala. 1918)).

### b. The Estate's Response

The Estate argues that the outcome contemplated by the Reeves decision is inapplicable to

the facts of this case in that this case does not involve a "clearly stated" condition precedent. In

Reeves, a letter by one of the parties to the contract "clearly stated" that the signing of certain

documents and making of certain payments constituted conditions precedent to the formation of a

contract. The Estate contends, as noted above, that no such clear statement exists in this case and

that the offer presented by Paul Revere did not set any conditions for acceptance.

### 4. Impossibility of Performance and Impossibility of Acceptance

### a. Paul Revere's Argument

Paul Revere further contends that Holter's death makes impossible his performance and his

acceptance of the settlement offer. Citing 17 C.J.S. Contracts § 51(c) and Corwin v. Salmon, 13

So.2d 190, 197 (Ala. 1943),[12] Paul Revere notes that the death of a party prior to his communication of acceptance of an offer to the offeror causes the offer to lapse. Again, Paul Revere claims that Holter never accepted the settlement offer and, instead, sought an extension of time to accept the offer. The company also contends that Holter provided no consideration in this arrangement because he continued to receive monthly disability benefits while, at the same time, failing to execute the Settlement Agreement and surrender the policies. As the representatives of a deceased offeree's estate cannot accept an offer of this sort on his behalf[13] and, according to Paul Revere, Holter never truly accepted the offer, Paul Revere contends that Holter's death caused the offer to lapse.

### b. The Estate's Response

In responding to Paul Revere's argument concerning the lapse of the offer as a result of Holter's death, the Estate simply notes that Holter expressly accepted the settlement offer prior to his death. The Estate notes that the Corwin court explicitly recognized that acceptance prior to death amounts to consideration and makes a contract binding. See Corwin, 13 So.2d at 197.

### 5. Personal Performance

#### a. Paul Revere's Argument

Finally, Paul Revere contends that even if Paul Revere and Holter did form a valid contract, the resultant contract is unenforceable in that it required personal acts by Holter which he never

---

[12] In Corwin, the Alabama Supreme Court held that the death of an optionor before acceptance is communicated to him by the optionee causes the offer to lapse if not supported by consideration.

[13] See 17 C.J.S. Contracts § 51(c).

performed. Contracts in which personal performance is of the essence and the duty imposed cannot be done as well by others are personal and do not survive death . See Cates v. Cates, 104 So.2d 756 (Ala. 1958); Pope v. Dickerson, 89 So. 24, 25 (Ala. 1921); Herren v. Harris, Cortner & Co., 78 So. 921, 922 (Ala. 1918). Generally, such cases involve circumstances or situations in which the particular skills or abilities of the individual are necessary or essential to the contractual agreement. Paul Revere claims that this case is similar in that Holter is the only individual who could have executed the Settlement Agreement and surrendered the policies. Thus, argues Paul Revere, only Holter could have performed under the contract. As Holter is dead and cannot perform, the contract cannot survive his death.

#### b. The Estate's Response

The Estate has not directly addressed Paul Revere's assertions regarding the personal acts allegedly required by the alleged contract. Presumably, it would argue that the formation of the contract does not require the actual performance of such acts and that this case is distinguishable from other "personal acts" contracts cases in that this case does not involve any special skill or ability as essential to the consideration of the contract.

### III. The Estate's Bad Faith Claim

Paul Revere has, in addition to seeking summary judgment in its favor on the question of whether it is bound under the alleged contract has sought summary judgment on the Estate's bad faith claim. The Estate does not seek summary judgment on the bad faith claim, but simply opposes Paul Revere's motion. The Alabama Supreme Court recently provided a brief exposition on the elements

of Alabama's bad faith refusal to pay an insurance claim tort:

> A plaintiff can establish a bad-faith refusal to pay an insurance claim by two theories: (1) that the insurer had no lawful basis for the refusal to pay the claim and knew that it had no lawful basis, or (2) that the insurer intentionally failed to determine whether there was any lawful basis for refusing to pay. Chavers v. National Sec. Fire & Cas. Co., 405 So.2d 1, 7 (Ala.1981). In National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357 (Ala.1982), this Court described the first theory as the "normal" bad-faith case, and the second as the "abnormal" case (see n. 5). As we stated in Employees' Benefit Ass'n v. Grissett, 732 So.2d 968 (Ala.1998):
>
>> "In 'normal' cases, the plaintiff's contract claim had to be so strong that the plaintiff would be entitled to a preverdict JML; if a fact issue made a JML inappropriate, then the defendant was entitled to a JML on the plaintiff's bad- faith claim. [Dutton,] 419 So.2d at 1362. Even so, a trial court's failure to enter a JML on the plaintiff's breach-of-contract claim is not fatal as long as the trial court correctly determines that the plaintiff has met the standard of proof required for a JML. Loyal American Life Ins. Co. v. Mattiace, 679 So.2d 229, 235 n. 2 (Ala.), cert. denied, --- U.S. ----, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996).
>> "....
>> "The rule in 'abnormal' cases dispensed with the predicate of a preverdict JML for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation. Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661 (Ala.1995); Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990)."
>
> 732 So.2d at 976.
>
> . . . [T]he requirements for a plaintiff to prove a bad-faith refusal to pay an insurance claim [include]:
>
>> (a) an insurance contract between the parties and a breach thereof by the defendant;
>> (b) an intentional refusal to pay the insured's claim;
>> (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
>> (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
>> (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."
>
> National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982). Requirements (a)-(d) represent the normal case; requirement (e) represents the abnormal case. Grissett, 732 So.2d at 976.

State Farm Fire and Cas. Co. v. Slade, Supreme Court Case Nos. 1961769 and 1961770 (Ala. Feb.

12, 1999) (not yet released for publication). This case clearly does not involve a normal case, as

described by the Alabama Supreme Court, because the amount now claimed would clearly not have been immediately due in the absence of an enforceable settlement.

### A. Paul Revere's Contentions

Paul Revere contends that it is entitled to summary judgment on the Estate's bad faith claims because Alabama does not recognize a claim for bad faith breach of a settlement agreement as opposed to an insurance contract and because the Estate cannot prove the absence of any debatable reason for the refusal to pay the proposed lump sum. Alabama courts have, according to Paul Revere, expressly declined to extend the tort of bad faith under Alabama law beyond a bad faith refusal to pay an insurance claim. See Alfa Mut. Ins. Co. v. Northington, 604 So.2d 758 (Ala. 1992)[14] and Baker v. State Farm Gen. Ins. Co., 585 So.2d 804, 809 (Ala. 1991). According to Slade and National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982), in order to proceed on a bad faith tort claim, the claimant must prove a breach of an "insurance contract." This case does not, argues Paul Revere, involve the breach of an insurance contract. The Estate is seeking to recover claims pursuant to an allegedly valid settlement agreement that was completed outside of the scope of the insurance contract other than under the terms of the policy. Paul Revere notes that Alabama does not recognize a claim for bad faith breach of a settlement agreement and, therefore, contends that the Estate's bad faith claim is due to be dismissed.

---

[14] Paul Revere notes that Alabama courts have allowed bad faith claims to succeed only in "extreme" circumstances. For example, the Northington court found that an action based on the tort of bad faith represented an extreme remedy available only in extreme circumstances concerning an unexcused failure to process a claim or to pay policy benefits. 604 So.2d at 760. This case, argues Paul Revere, does not involve an extreme violation of an insurer's duty to pay a claim.

Paul Revere also argues that even if the Alabama bad faith tort could be applied to these facts, summary judgment on the bad faith claim would still be proper. Paul Revere notes that a claimant "must show that the insurance company had no legal or factual defense to the insurance claim." Bowen, 417 So.2d at 183. Further, "[t]o defeat a bad faith claim, the defendant does not have to show that its reason for denial was correct, only that it was arguable." Liberty Nat'l Life Ins. Co. v. Allen, 699 So.2d 138 (Ala. 1997). Paul Revere contends that its reasons for denial of the claim were, at a minimum, "arguable," and that they were, in fact, correct. The company thus argues that because the Estate cannot and has not shown the absence of any "debatable reason" for the refusal to pay the claim, this court should grant summary judgment on the Estate's bad faith claim

## B. The Estate's Bad Faith Arguments

The Estate contends that the agreement at issue clearly involved an insurance agreement. Holter, according to the Estate, had a continuing claim under his policies with Paul Revere. Paul Revere elected to offer Holter a lump sum payment in lieu of continued payments under those policies. According to the Estate, the settlement represented a modification of the timing and duration of the benefit payments that Holter was due to receive under his insurance policies. The idea that the settlement reached between Holter and Paul Revere was somehow separate and distinct from the insurance policies is, according to the Estate, a fiction.

According to the Estate, requirements (b), (c) and (d), as outlined above, are not in dispute in this case and are, in fact, established by Paul Revere's own records. The Estate argues that Paul Revere's records indicate the existence of and the company's knowledge of the formation of an enforceable contract through a valid offer and acceptance, thus establishing requirements (c) and (d).

Requirement (b) is not at issue, as the failure to pay the claim in this case was clearly intentional.

The Estate contends that it is significant that Paul Revere has not only refused to pay the lump sum payment, but also failed to pay Holter his monthly benefits due under the policies for the month of November, 1998. If the settlement had not been finalized, Paul Revere was bound, so far as it was admittedly aware, to pay Holter for that extra month. Although Holter was already dead as of November, 1998, Paul Revere was not notified of his death until December 2, 1998 or some time thereafter. Thus, the Estate argues that Paul Revere either (1) failed to make the November payment because the company considered the settlement agreement to have been completed, in which case the Estate claims to have an action against Paul Revere for bad faith failure to pay the lump sum,[15] or (2) failed to make the November payment for absolutely no reason and without justification, in which case the Estate, again, claims to have a viable bad faith claim. The Estate argues that whether or not Holter was deceased, the company's failure to pay any benefits at all is evidence of its bad faith with respect to its relationship with Holter.

The Grissett case makes clear the fact that in "normal" cases, the party bringing the bad faith claim may only maintain that claim if his or her underlying contract claim is "so strong that the [claimant] would be entitled to a preverdict JML" or if "the trial court correctly determines that the plaintiff has met the standard of proof required for a JML." Grissett, 732 So.2d at 976. The Estate argues that summary judgment on the bad faith claim at this time is inappropriate because, even if this court does not grant its motion for summary judgment on the breach contract claim, the court may still conclude that the Estate has met its burden at trial. Thus, the Estate contends that this court

_____

[15] The Estate claims that the lump sum was due and payable as of October 1, 1998 – the date of Holter's verbal acceptance.

should reserve its ruling on the bad faith claim.[16]

## Court's Conclusions

The court concludes that there is a question of fact as to the contract claim. On the one hand, the defendant can reasonably argue an oral acceptance. On the other hand, the plaintiff can reasonably argue that Holter's request for further benefits payments suggests that there had not been a settlement. The issue is one of fact. On the other hand, plaintiff's motion is clearly due to be granted on the defendant's bad faith counterclaim. Defendant's position is, at best debatable, and plaintiff has a reasonable basis for debating it. The overall circumstances were unusual and defendant does not have a clearly established claim.

Prior to trial, the parties may wish to research the following issues. If Holter had information that his condition was imminently terminal, did he have a duty to disclose it? On the other hand, if the parties had an enforceable agreement, was any further performance excused by Holter's death.

---

[16] The Estate also contends that its burden may not be as great as in the "normal" case. In Continental Assurance Co. v. Kountz, 461 SO.2d 802, 806 (Ala. 1984), the Alabama Supreme Court noted that although in the "normal" case the plaintiff must be entitled to a directed verdict on the contract claim, "some cases will arise in which the plaintiff will not have to meet the directed verdict test in order to recover on the bad faith claim . . ." The court found that Kountz was not a "normal" case, as the parties had stipulated to the fact that there was a contract. The Estate argues that this case is similar in that Paul Revere has acknowledged the facts which, the Estate contends, give rise to the formation of a contract in this case. Thus, the Estate argues that it may not be subject to the requirements of the "normal" bad faith claim.

This _____ day of August, 1999.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**